UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

CANAN KANMAZ

                                                  Case No.:

                         **Plaintiff,**

        **-against-**

**ROACH & MURTHA ATTORNEYS AT LAW P.C.**
      **f/k/a ROACH & MURTHA, P.C.,**
**GEMINI EQUITIES, LLC, and**
**ARIES CAPITAL PARTNERS, INC.,**

                       **Defendants.**

-----------------------------------------------------------------X

## ORIGINAL COMPLAINT AND JURY DEMAND

       Plaintiff Canan Kanmaz brings suit against debt collectors Roach & Murtha Attorneys At Law P.C. f/k/a Roach & Murtha, P.C., Gemini Equities, LLC, and Aries Capital Partners, Inc. for violations of the Fair Debt Collections Practices Act, 15 U.S.C. § 1692 *et seq.* and of New York General Business Law § 349, against Roach & Murtha Attorneys At Law P.C. f/k/a Roach & Murtha, P.C. for violation NY Judiciary Law § 487, and against Gemini Equities, LLC for violations of the New York Exempt Income Protection Act ("EIPA"). Defendants, *inter alia,* deceptively and unfairly withholding notice of Plaintiff's right to exempt funds, filing a satisfaction of judgment to retain those exempt unemployment funds garnished pursuant to a false affidavit of service, and seeking to collect attorney's fees for judgment collection with no legal right to the same.

## Summary of Claims[1]

       Defendants are a debt collection law firm, Roach & Murtha Attorneys at Law, P.C. f/k/a Roach & Murtha, P.C., and the purchaser and servicer of "distressed or doubtful" judgments,

---

[1] This summary is for the convenience of Defendants and the Court. The summary is not intended to limit the basis of Plaintiff's claims as the full factual basis for the claims are laid out in far greater detail in the statement of facts.

debt collectors Gemini Equities, LLC and Aries Capital Partners, Inc., respectively. Unbeknownst to Ms. Kanmaz, in 2008 a default judgment, based on a false affidavit of service, was entered against her. In 2004 Ms. Kanmaz moved to Turkey where she lived until 2016, and knew nothing of the suit or the fraudulently entered judgment.

Twelve years after the judgment was entered, Defendants unlawfully sought to collect the fraudulent judgment. Prior to being able to lawfully collect, Defendants were required to send a notice of the judgment stating that Gemini had taken the assignment of the judgment. Had Defendants met this requirement, Ms. Kanmaz would have learned of the judgment and could have taken steps to dispute the debt and vacate the judgment without being harmed by Defendants subsequent deceptive collection methods.

On July 2, 2020, Roach, on behalf of Gemini and Aries, issued an Information Subpoena and Bank Restraint, and immediately served it Ms. Kanmaz's bank. No later than July 10, 2020, all of the money in Ms. Kanmaz's bank account was frozen pursuant to the Restraint. All of the restrained funds, $9,574.81, was legally protected from restraint by the Exempt Income Protection Act, NY CPLR 5222-a. $8,406.30 of the funds were exempt unemployment benefits, and the remaining amount, $1,168.51, was below the standard protected amount. Defendants also froze Ms. Kanmaz's joint bank account with her husband.

Ms. Kanmaz was panicked, scared, and confused. She had no idea who was restraining her account, or why, or even if there was a debt alleged against her or her husband. She did not know Roach could not legally restrain her unemployment funds, accrued at the then-height of the COVD-19 pandemic. Roach, on behalf of Gemini and Aries, played on that fear, desperation, and lack of knowledge to dupe Ms. Kanmaz to sign a "conditional release," which allowed Roach to take from the bank account $6,796.76, the full amount the judgment. Roach emailed

the release on July 16 and received the executed release the morning of July 17, 2020.

Later that day, Roach added metered postage dated July 17 to an envelope containing documents *backdated to July 2* containing notices required by the FDCPA and state law to prevent exactly what Roach did here. Under the FDCPA, 15 U.S.C. § 1692g, Defendants were required to disclose information about the debt and Ms. Kanmaz's right to force Defendants to cease collection activities – including issuing the Restraint or demanding the signing of a conditional release. Had Ms. Kanmaz timely received this notice she would have known her rights, and could have told Defendants she was never served with a lawsuit or otherwise disputed the debt. Along the same lines, under NY CPLR 5222(d), Defendants were required to disclose the existence of the judgment and – critically – that unemployment benefits were entirely exempt from restraint. Had Ms. Kanmaz timely received this notice she would have known her monies were protected and should have been released.  We do not know how long Roach held on to the July 17 meter stamped letter before mailing it, but Ms. Kanmaz did not receive it until around July 21 or 22, about the same time she received disclosures from the bank which also stated that unemployment funds were exempt.  Had Defendants timely complied with their legal obligations – instead of backdating the letters and mailing them after they received the release.  They would not have been able to restrain Ms. Kanmaz's exempt funds, much less seize the money. In addition, the backdated 1692g notice form letter includes threats of obtaining attorneys' fees and court costs for judgment collection when there is no such right.

Defendants were just getting warmed up. After Ms. Kanmaz received the disclosures she immediately emailed Roach and her bank telling them the money in the account was unemployment money, that she was tricked, and demanded her money back. She said she was out of the country from 2003 – 2016, could not have been served, and said she will move to

vacate the judgment if she had to. Rather than following up on Ms. Kanmaz's claims, Defendants doubled down and did not return the money.

Ms. Kanmaz did not give up. She went to Court – during the COVID pandemic – and filed *pro se* order to show cause (OSC) on July 24 and then as second OSC on August 4 after attaching additional documents. The Second OSC, which Roach received on August 7, attached irrefutable documentary evidence, including stamped passports, that Ms. Kanmaz was out of the country during the year of the alleged service and bank statements showing the unemployment benefits direct deposited from the NY Department of Labor.

Defendants again doubled down. On August 13 Roach filed an opposition that falsely stated that on July 31 – prior to the filing of the second OSC -- they had filed a satisfaction of judgment. Therefore, Roach argued the court should deny that application because, allegedly, on the date of the filing of the second OSC the judgment had already been satisfied, depriving the court jurisdiction.  In fact, Roach only filed the satisfaction of judgment on August 10, three days *after* it received the Second *pro se* OSC. Based on the misrepresentation, on August 14, 2020 the court denied the application to vacate judgment given the satisfaction of judgment.

For these reasons and others, all Defendants have violated the FDCPA and GBL 349, Roach violated Judiciary Law § 487, and Gemini violated the Exempt Income Protection Act.

## JURISDICTION AND VENUE

1.     The Court has federal question jurisdiction over the lawsuit because the action arises under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq., ("FDCPA"). Jurisdiction of the Court arises under 28 U.S.C. § 1331 in that this dispute involves predominant issues of federal law under the FDCPA. The Court has supplemental jurisdiction under 28 U.S.C. §1367 over Plaintiff's state law claims because said claims are so related to the claims within the

Court's original jurisdiction that they form part of the same case or controversy under Article 3 of the United States Constitution.

2.      Venue in this District is proper because all or a substantial part of the events or omissions giving rise to their claims occurred in Suffolk County, New York.

## PARTIES

3.      Plaintiff Canan Kanmaz ("Ms. Kanmaz") is an individual currently residing in Nassau County, New York.

4.      Defendant Roach & Murtha Attorneys At Law P.C. f/k/a Roach & Murtha, P.C. ("Roach") is a domestic professional corporation organized and existing under the laws of the state of New York. Roach engages in business in New York and maintains a designated agent for service of process in New York. This suit arose out of said Defendant's business in New York.

5.      Roach's primary (indeed sole) purpose is to collect charged off consumer debt owned by another, and seek to collect on those debts by, *inter alia*, issuing tens of thousands of post-judgment collection devices (e.g. information subpoenas, bank restraints, wage garnishments) and collection letters and filing debt collection lawsuits and motions in debt collection lawsuits. Roach does so regularly. Roach is therefore a "debt collector" as defined in 15 U.S.C. § 1692a(6).

6.      Defendant Gemini Equities, LLC ("Gemini") is a limited liability corporation organized under the laws of the State of New York. Gemini is registered as a debt collector with the New York City Department of Consumer Affairs. Gemini's principal (indeed sole) purpose is the purchase of putative consumer debt, primarily (if not exclusively) the purchase of judgments rendered against consumers for lawsuits seeking to collect consumer debts. Gemini then collects on those purchased judgments by using law firms like Roach to collect on those judgments by

issuing thousands of information subpoenas, bank restraints, and garnishments, and sending thousands of collection letters. Gemini is a debt collector as defined under the FDCPA.

7.      Defendant Aries Capital Partners, Inc. ("Aries") is a corporation organized under the laws of the State of New York. Aries is registered as a debt collector with the New York City Department of Consumer Affairs. Aries' principal (indeed sole) purpose is servicing the collection of charged off consumer debts, primarily (if not exclusively) debts reduced to judgments. This servicing includes but is not limited to:

- arranging for the purchase of accounts by certain limited liability corporations such as Gemini, Aquarius Capital, LLC, CDR Equities, LLC, Libra Equities, LLC, and Virgo Capital, LLC;
- selecting collection law firms like Roach to collect on accounts; and
- performing daily management of accounts, including supervision of collection law firms like Roach.

8.      It regularly engages in this conduct to collect on debts owed or due to Gemini and other corporations. Aries is a debt collector as defined under the FDCPA.

9.      Matthew Blake is the CEO of Aries and President of Gemini, and either president or managing agent of all the other limited liability corporations which Aries forwards consumer debt judgments to for collection.

10.     Matthew Blake uses his Aries email address, mattblake@ariesdata.com , as the contact email address for Gemini, as well as for the other limited liability corporations.

11.     Aries, Gemini, and the other limited liability corporations all share the same address of 243 Route 100, Somers, NY 10589-3203.

12.     Upon information and belief, the limited liability corporations including Gemini are inadequately capitalized and are set up by Aries to be used for a limited period or with specific portfolios of consumer debt judgments.

13.    Upon information and belief, the limited liability corporations including Gemini have no independent discretion from Aries, with Aries essentially making all decisions for the corporations.

14.    Upon information and belief, the limited liability corporations including Gemini are not dealt with by Aries at arms-length in transactions, including but not limited to the purchase of consumer debt judgment portfolios, such as by Matthew Blake signing documents in the chain of title for both Aries and the respective limited liability corporation.

15.    Upon information and belief, Gemini is not treated as an independent profit center – when it makes a profit, so does Aries.

16.    Upon information and belief, Aries may otherwise disregard the corporate formalities of the limited liability corporations including Gemini that are not currently apparent given their internal nature, such as Aries paying or guaranteeing the debts of the limited liability corporations and whether the property of Aries (beyond the shared office already mentioned) is used by the limited liability corporations as if it were their own.

17.    Gemini is not a separate corporation but a mere alter ego of Aries. Gemini was created, along with the other limited liability corporations, to put a level of (illusory) separation between Aries and the collection firms like Roach. When Aries uses corporations like Gemini to collect on debts through the collection firms like Roach, it obfuscates Aries' role in and responsibility for the collection; for most consumers and courts, they never know about this third entity involved, despite that it performs the daily management of the account and selects the collection firms like Roach.

18.    Aries and the limited liability corporations like Gemini operate as one whole entity.

19.    The corporate separateness between Aries and Gemini should be disregarded, and the

conduct of Gemini should be treated as the conduct of Aries for the purposes of fact and liability.

20.    Even without disregarding the corporate separateness between Aries and Gemini, because they operate as a joint venture for the purchase and collection of judgments on consumer debts, Aries and Gemini are jointly and severally liable for their conduct in collecting on these judgments, including the putative judgment against Ms. Kanmaz.

21.    Subsequent use of "Gemini" will encompass both Aries and Gemini unless stated otherwise.

22.    Gemini hired Roach to collect the putative judgment arising from *Erin Capital Management, LLC v. Kanmaz, et al,* Index No. CV-002320-08/CE, venued in the Suffolk County District Court – First District Civil Part, and all conduct of Roach's described below was in the scope of this employment by Aries. Thus Aries is jointly and severally liable for the acts it takes through its agent debt collector Roach.

## STATEMENT OF FACTS

### Default Judgment by False Affidavit of Service

23.    The judgment at issue in this case arises from the lawsuit captioned *Erin Capital Management, LLC v. Kanmaz, et al,* Index No. CV-002320-08/CE, venued in the Suffolk County District Court – First District Civil Part, filed on January 24, 2008 (hence "the Collection Lawsuit").

24.    The Collection Lawsuit was brought by then putative creditor Erin Capital Management, LLC over a Citibank credit card debt allegedly owed by Canan Kanmaz of $1,661.25. **Exhibit A** (Collection Lawsuit).[2]

---

[2] All exhibits to this complaint are incorporated by reference in their entirety.

25.    The Collection Lawsuit also sought attorney's fees of $332.25. **Exhibit A**.

26.    On April 7, 2008, Bassan Shatara, working for Triple A Process Service, executed an affidavit of service that alleged the summons and complaint for the Collection Lawsuit were served on Ms. Kanmaz by nail and mail on April 3, 2008 at a Bay Shore, NY address, and that a "Mr. Schwartz, Neighbor" confirmed that Ms. Kanmaz was not in the military. **Exhibit B** (Affidavit of Service). The process server claimed the Bay Shore address was the dwelling place or usual place of about of Ms. Kanmaz, which was not true. [3]

27.    In fact, Ms. Kanmaz was not in the United States, having moved to Turkey on November 7, 2004, where she lived until October 8, 2016.

28.    Ms. Kanmaz moved out of the Bay Shore address on October 15, 2003, and lived in Dix Hills, NY until leaving the United States on November 7, 2004.

29.    When Ms. Kanmaz did live at the Bay Shore address, she did not know anyone named "Mr. Schwartz" – the only neighbor she knew was her landlord, Robert Demario.  And no neighbor could confirm that she resided there and that she was not in the military when she had not resided at the address for four years.

30.    Because Ms. Kanmaz did not live at the Bay Shore address in April 7, 2008, and in fact had not lived there for almost 4 years, the affidavit of service is false on its face.

31.    On June 10, 2009, using the false affidavit of service, a default judgment was entered against Ms. Kanmaz for a total of $3,082.19, $141 of which was costs. **Exhibit C** (Default Judgment). Attorney's fees were expressly "WAIVED." *Id.*

32.    Upon information and belief, between June 10, 2009 and July 2, 2020, the Default

---

[3] Shatara is well versed in executing false affidavits of service.  Shatara was one of the process servers that formed a basis of the class action suit *Burkett v. Houslanger & Associates, PLLC* (1:19-cv-02285) (ED NY).

Judgment was sold by Erin Capital, perhaps to one or more judgment assignees, and ultimately to Gemini. Aries was the servicer of the debt for Gemini.

33.    Upon information and belief, sometime on or before July 2, 2020, Aries placed the Gemini judgment to attorney Roach for collection.

34.    However, a substitution of attorney has never been filed, with Eltman Law, P.C. still listed as the attorney for the Plaintiff. **Exhibit D** (eCourts).

35.    Ms. Kanmaz never received notice of the collection lawsuit, default judgment, the notice of the (putative) assignment of the judgment from Erin Capital to any putative judgement assignee, including Gemini, nor any collection letters or other communications from Roach prior to the July 10, 2020 restraint of her bank account.

**Roach Restrains the bank accounts of Ms. Kanmaz and her husband, including $8,406.30 of Exempt Unemployment Payments**

36.    Ms. Kanmaz returned to the United States on October 8, 2016.

37.    The return was initially just a visit to the country, but in November of 2016, Ms. Kanmaz met the man who became her husband, and decided to stay in the United States to be with him.

38.    Like many people in the United States during the COVID-19 pandemic, Ms. Kanmaz was experiencing a great deal of emotional and financial distress.

39.    Her employer, Buybuy Baby Inc., cut her hours down to two days a week on or around March 15, 2020. Her husband lost his work as a taxi driver because his medical history made him especially vulnerable to COVID-19. Ms. Kanmaz applied for unemployment in order to pay for rent and car payments.

40.    Starting with the first deposit of unemployment into her checking account on May 15, 2020 and through July 10, 2020, almost all of the funds in the checking account were

unemployment.[4]

41.     On or around July 2, 2020, Gemini, through Roach, sent a Restraining Notice and Information Subpoena to JP Morgan Chase to collect on the (fraudulently obtained) default judgment. **Exhibit E** (Information Subpoena and Restraining Notice Sent to Bank).

42.     On July 10, 2020, $8,406.30 of the $9,574.81 in the checking account was unemployment deposits.

43.     Sometime after July 2, 2020, and no later than July 10, 2020, Roach, on behalf of Aries, restrained Ms. Kanmaz's account by $13,571.04, more than the entire $9,574.81 in the account, pursuant to the now $6,785.52 default judgment obtained with the false affidavit of service. **Exhibit F** (June-July Bank Statement showing the bank deducting on July 10, 2020 the $75 Legal Processing Fee, imposed for processing the bank restraint).

44.     Defendants' restraint was unlawful because it restrained all of the money in Ms. Kanmaz's account, approximately $9,574.81, when all of the money was exempt from restraint. The funds in the account consisted of $8,406.30 of unemployment payments received since May 15, 2020. Under NY CPLR § 5205 *et seq.,* unemployment insurance is exempt from restraint. Only $1,168.51 of the money was from a non-exempt source, but even these funds were entirely exempt. Pursuant to NY CPLR § 5205, approximately $2,850 of funds in a bank account containing government benefits is exempt regardless of its source. The $2,850 base exemption amount, plus the $8,406.30 of unemployment funds, well exceeds the $9,574.81 in the account. Thus Defendants restrained all of the money in the account when it was prohibited from

---

[4] All of the unemployment deposits would be counted towards the balance of the account by the lowest intermediate balance principle. As the Second Circuit noted in *Arias,* "exempt funds are the last funds to leave the account. For example, if $1,000 of exempt funds and $1,000 of non-exempt funds are deposited, and then $1,000 is withdrawn, the remaining $1,000 is exempt." *Arias v. Gutman, Mintz, Baker & Sonnenfeldt LLP*, 875 F.3d 128, 132 (2d Cir. 2017) *citing United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1159 (2d Cir. 1986).

restraining any of the money in the account.

45.     In addition to these prohibitions under NY CPLR § 5205, the Federal Pandemic Unemployment Compensation (FPUC) provided by the CARES Act was intended by Congress to be emergency relief to help people survive the mass unemployment caused by the COVID-19 pandemic – garnishment of it, especially in collection of a default judgment procured by a false affidavit of service, undermines the emergency relief's purpose and is reprehensible.

46.     The joint account that Ms. Kanmaz had with her husband, Engin Bostanci, also was restrained for the same amount of $13,571.04. **Exhibit G** (Bank Notice of Joint Account Restraint Mailed to Mr. Bostanci).

47.     Ms. Kanmaz learned of the bank restraint on July 10 when she checked her bank account and then checked her joint account with her husband.

48.     Ms. Kanmaz never received, and upon information and belief Defendants never sent, a notice of assignment or a section 1692g Notice prior to this bank restraint, let alone on the yet-unknown date when the account was assigned to Gemini.

49.     Upon information and belief, Defendants took no steps to send a notice of assignment or to take any steps to discover whether one had been sent in the past by any of the other entities. Ms. Kanmaz never received a notice of assignment from anyone regarding the judgment or, indeed, regarding the underlying alleged debt.

50.     A condition precedent for an assignee of a putative debt (including assignments of judgments) to collect is for a notice of assignment to be sent to and received by the putative debtor.

51.     By restraining her bank account and by signing and (ultimately) causing the Restraint to

be served on Ms. Kanmaz (**Exhibit E**), Roach implicitly represented to Ms. Kanmaz that that an attorney meaningfully reviewed the facts and circumstances of the file and made a reasoned professional determination that Roach had the right to restrain her bank account and to lawfully issue the Restraint.

52.    However, if Roach had performed a meaningful attorney review of Ms. Kanmaz's account, they would have determined whether a notice of assignment of the putative debt to Gemini was ever sent to Ms. Kanmaz and whether a 1692g Notice was sent to Ms. Kanmaz.

53.    Due to both of the bank accounts being restrained, Ms. Kanmaz initially believed the restraints were from a debt owed by her husband.

54.    Ms. Kanmaz went to a branch of Chase Bank to determine why the accounts had been restrained, where she was told that the bank did not know anything other than the judgment number and a phone number for Defendant Roach.

55.    Ms. Kanmaz's husband called Roach on July 11, 2020 – during this phone conversation, Roach did not say anything about the debt, so both Ms. Kanmaz and her husband still believed the restraints had been caused by a debt of her husband.

**Roach Uses their Illegal Restraint to Pressure Ms. Kanmaz into Signing a Conditional Release Forfeiting $6,796.76**

56.    Still believing the restraints were his fault and having gotten the joint bank account released, Ms. Kanmaz's husband transferred funds on July 13, 2020 from the joint account to Ms. Kanmaz's account to make up for the money being restrained.

57.    On July 16, 2020, Roach emailed a Conditional Release to Mr. Bostanci for Ms. Kanmaz to sign, notarize, and email back. **Exhibit H** (July 16, 2020 Roach Email).

58.    Mr. Bostanci and Ms. Kanmaz were shocked to see the Conditional Release, and the

alleged debt, was for her and not for Mr. Bostanci.

59.     The Conditional Release required the sending a certified bank check cut from her account to Roach in the amount of $6,796.76. **Exhibit I** (Conditional Release).

60.     Not knowing her rights and believing this was the only way to get back her money, Ms. Kanmaz signed the Conditional Release on July 17, 2020 and returned it to Roach.

61.     On July 20, 2020, Roach withdrew the $6,796.76 from Ms. Kanmaz's checking account.

**Roach Withheld Notice to Ms. Kanmaz of Her Rights to Pressure Her into Settlement, Deceptively Back-Dating the Notices to Misrepresent When They Were Sent to Ms. Kanmaz**

62.     At 12:14 PM on July 17, 2020, Roach's office acknowledged receipt of the executed Conditional Release and stated, "I fwded [sic] to legal for processing."   **Exhibit K** (July 17 Roach Email).

63.     That same day– and, on information and belief, after receiving the executed Conditional Release -- Roach affixed metered postage dated July 17 on an envelope that contained two key statutorily required documents, all of which were dated fifteen days earlier, July 2, 2020. *See* **Exhibit J** (Backdated Letters). The Backdated Letters were mailed between July 17 and July 20, and received by Ms. Kanmaz on or about July 21 or 22, 2020.

64.     Roach was statutorily required to send the Backdated Letters either prior to issuing the Information Subpoena & Restraint on July 2, or certainly before sending the conditional release to Ms. Kanmaz on July 16 and duping her into executing and emailing back the Conditional Release on July 17.

65.     The first statutorily required document in the Backdated Letters is the "NOTICE TO JUDGMENT DEBTOR OR OBLIGOR." **Exhibit J**, p. 1 ("Judgment Notice")

66.    Under CPLR 5222(d), debt collectors like Defendants are required to provide this Judgment Notice to Ms. Kanmaz within 4 day of the service of the Restraint on the bank.

67.    Instead of complying with this law, Defendants sent out the notice seven days after the service of the restraining notice on the bank to affix the postage to the envelope mailing the documents, and perhaps seven, eight, or nine days to actually mail the documents **Exhibit J,** p. **6** (July 17, 2020 Envelope).  Again, the Backdated Letters were not received until July 21 or July 22, 2020.

68.    The delay in sending this notice was done to conceal from Ms. Kanmaz the legally required notices of her rights to challenge the restraint because of her exempt unemployment income.

69.    This failure to send the notice was deceptive and shows willful disregard for Ms. Kanmaz's rights for which the letter would have provided notice of, such as her unemployment funds being exempt and that she could have consulted an attorney or gone to court to get her money back.

70.    CPLR 5222(d) Judgment Notice requires prompt notice of a consumer's rights when a bank restraint has been served, and Roach subverting that process led Ms. Kanmaz to take actions she would not have otherwise taken had she known she had choices and rights other than signing the Conditional Release.

71.    The Backdated Letters also included a notice with language required under the FDCPA, 15 U.S.C. § 1692g. **Exhibit J**, p. 2 (the 1692g Notice).

72.    But-for Defendants withholding the 1692g Notice, Ms. Kanmaz would have been informed of her rights under the FDCPA and would have exercised them rather than signing the

Conditional Release resulting in Defendants taking $6,796.76 from her.

73.    Specifically section 1692g requires debt collectors to provide notice "that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector." 15 U.S.C. § 1692g(a)(4).

74.    Roach did in fact include such a statement in their 1692g Notice (**Exhibit J**, p. 2), but because they deceptively withheld it until after they pressured Ms. Kanmaz to pay the debt, it did not serve its purpose of alerting Ms. Kanmaz about her right to dispute the debt and receive a copy of the judgment obtained against her.

75.    Ms. Kanmaz had tried repeatedly to get more information about the debt, so she surely would have made such a dispute, and accordingly received a copy of the judgment (**Exhibit C**), which would show her in pertinent part that her address was listed as 1617 Heckscher Ave. when she in fact lived in Turkey during that time.

76.    Ms. Kanmaz emailed Roach and the Bank on July 21, 2020, telling them her defense to the false affidavit of service, and that she wanted her money back and to have the judgment vacated. **Exhibit L** (July 21, 2020 Email to Roach). Had Roach timely sent Ms. Kanmaz the notices as required by the CPLR and 1692g of the FDCPA, then either the bank account would never have been restrained or at least promptly released by Ms. Kanmaz using those exemption claim forms she should have been provided.

77.    But for Roach withholding the notices, Ms. Kanmaz would have immediately known the debt sought to be collected was alleged to be owed by her, not her husband.  Ms. Kanmaz could

have then informed Defendants that she had no notice of the collection lawsuit because she was never served.

78.    Had Defendants informed Ms. Kanmaz of her 1692g rights, she could have forced Defendants to cease collection activities – such as issuing the Restraint – by informing Defendants she was never served with a lawsuit.

79.    Because the judgment at issue was procured via a false affidavit of service, Defendants were not privileged to restrain the funds and use that restraint to pressure Ms. Kanmaz into signing the Release.

80.    Ms. Kanmaz finally received the written notice of the bank restraint from her bank and from Roach on or around July 21, 2020. **Exhibit M (**Notice of Restraint Mailed by Bank to Ms. Kanmaz**).**

81.    Ms. Kanmaz was outraged to see that the failure to serve the summons and complaint on her could have been used to get the improperly obtained default judgment vacated.

**Roach's Collection Letter to Ms. Kanmaz and standard practice of seeking attorney's fees and costs regardless of entitlement under law.**

82.    The 1692g Notice in the Backdated Letters (**Exhibit J**, p. 2) also was deceptive and unfair because it sought attorney's fees and costs without entitlement under the law.

83.    The 1692g Notice violates the FDCPA by misrepresenting that "As a judgment has been entered, you may be charged with attorney fees [and] court costs…as applicable by law in addition to the present balance." *Id.*

84.    As aforementioned, $141 of the judgment principle of $3,223.19 was attorney's fees and attorney's fees were expressly "WAIVED." **Exhibit C**.

85.    Moreover, Roach has no legal basis to seek or obtain attorney's fees or court costs for

post- collection of a consumer debt. Even if Roach was so permitted, attorney's fees were expressly waived in the judgment. **Exhibit C**. Further, court costs had already been awarded for $141 and included in the principal amount of the judgment. *Id.*

86.    Roach violated the FDCPA, and all Defendants violated GBL 349 by, *inter alia*, falsely representing they have a right to attorney's fees and court costs in judgment collection when attorney's fees were in fact not authorized by law.

87.    The 1692g Notice (**Exhibit J**, p. 2), upon information and belief, is a form letter that Defendant Roach uses as its standard practice in attempting to collect on judgments, regardless of whether there is actual entitlement to attorney's fees and costs.

88.    The Letter is not only boilerplate, but specifically contains a broad range of inapplicable boilerplate language that suggests that Roach performs no meaningful attorney review of the letter before sending it to consumers.

89.    For example, the Letter states "If this judgment is a result of a motor vehicle accident, your license may be subject to suspension," suggesting Roach itself does not bother to check what the judgment is at all, let alone whether the debt collector can charge attorney fees in addition to the present balance of the judgment. *Id.*

90.    In fact, the collection letter attached as Exhibit E to the Complaint in another FDCPA lawsuit against Roach, *Drummer v. Roach & Murtha Attorneys at Law, P.C.,* Case No. 1:20-cv-01162 (E.D. N.Y.), is identical to the Letter sent to Ms. Kanmaz, despite arising from a judgment in a negligence tort action. **Exhibit N** (*Drummer* Complaint).

91.    Roach used this form letter to threaten to attempt to collect attorney's fees and costs it was not entitled to under contract or law in another FDCPA lawsuit, *Fowler-Shaw v. Roach &*

*Murtha*, Case 2:20-cv-05042-GRB-SIL (E.D. N.Y.) **Exhibit O** (*Fowler-Shaw* First Amended Complaint) (excluding non-relevant exhibits).

92.     Roach's use of the Collection Letter has a broad impact on consumers at large.

**Ms. Kanmaz files a *pro se* OSC with extensive evidence but, in order to retain the funds it garnished pursuant to a default judgment procured via a false affidavit of service, Roach deceptively filed a Satisfaction of Judgment to prevent the Court from hearing the OSC**

93.     Ms. Kanmaz filed a *pro se* OSC on July 23, 2020, but the Court on July 24, 2020 declined to enter it because it did not attach additional supporting documents. **Exhibit P** (First *pro se* OSC). Ms. Kanmaz was completely unfamiliar with the US legal system and, while speaking some English, had difficulty interpreting the legal language and terms in a second language.

94.     But she did not give up, following the Court's instruction she filed another *pro se* OSC on July 24, 2020, this time laying out that Roach had pressured her into signing the Conditional Release and that she had been living in Turkey when the affidavit of service claimed she was served with the Collection Lawsuit. **Exhibit Q** (Second *pro se* OSC). She provided bank statements, her last driver's license and interim license, her old passports from 1991-2005 and 2012-2020, an entry-exit paper from Turkey with English translation, and the Conditional Release.

95.     On July 25, 2020, Ms. Kanmaz filed a complaint with the Consumer Financial Protection Bureau against Roach. **Exhibit R** (Kanmaz CFPB Complaint).

96.     In this complaint, Ms. Kanmaz detailed the same deceptive conduct listed above: "On the 22nd of the July, I received letters from the company and my bank separately. It is written in 2 separate letters that I can appeal. These letters were mailed to me on July 17, when they

guaranteed to get the money from me." *Id.*

97.     The complaint was sent to Roach, and on July 27, 2020, Roach responded that the settlement was voluntary "upon receiving debt validation" and that they "do not have to provide legal advice to the consumer." *Id.*

98.     Ms. Kanmaz had been given no validation of her debt prior to the Conditional Release, and Roach was in fact required by law, CPLR 5222, to provide Ms. Kanmaz with notice of her rights within 4 days of serving the restraining notice on the bank.

99.     Finding merit in the application, on August 4, 2020 Judge Cheryl M. Helfer signed the second *pro se* OSC and set a hearing for August 11, 2020. **Exhibit Q** (Second *pro se* OSC).

100.    On August 7, 2020, Ms. Kanmaz sent the OSC by overnight mail to Roach, which received it that day. **Exhibit S** (USPS Tracking for OSC).

101.    When Roach received the OSC on August 7, 2020, the irrefutable evidence that the affidavit of service for the Default Judgment was false should have prompted the debt collector to return the funds (which it had taken through deceptively withholding the notice of Ms. Kanmaz's rights) and stipulate to vacate the judgment and discontinue the case.

102.    While Defendants had never been privileged to take Ms. Kanmaz's funds pursuant to the judgment because the judgment was fraudulently obtained, at the latest upon receipt of Ms. Kanmaz's OSC on August 7, 2021, the Defendants knew that the judgment they relied on was invalid due to the lack of a proper truthful affidavit of service and thus that the funds have been improperly restrained, making the subsequent Stipulation improper as well.

103.    Instead of returning the funds Defendants had taken, with wanton and willful disregard for Ms. Kanmaz's rights and in pursuit of keeping the illegally garnished funds through unfair

and unconscionable means, Roach filed a Satisfaction of Judgment on August 10, 2020. **Exhibit T** (Satisfaction of Judgment).

104.    Roach filed the Satisfaction knowing that if the Court saw a Satisfaction on the record that it would abstain from ruling on the merits of the *pro se* Order to Show Cause.

105.    On August 13, 2020, Roach filed an Opposition to Ms. Kanmaz's Second *pro se* OSC. **Exhibit U** (Opposition to Second *pro se* OSC).

106.    Filing an Opposition when on notice that the judgment had been obtained with a false affidavit of service, as well as being on notice that Ms. Kanmaz had not received notice that her unemployment funds were exempt, is deceptive and unfair.

107.    In addition to the Opposition itself being unfair, the Opposition contained misrepresentations that had the intent of preventing Ms. Kanmaz's OSC from being heard on the merits via the Satisfaction of Judgment.

108.    The first misrepresentation is that the Satisfaction of Judgment was filed on July 31, 2020. **Exhibit U**, ¶ 7. While the papers have the date July 31, 2020, the court's stamp at the time of filing clearly shows the actual date it was filed: August 10, 2020. **Exhibit T**. Upon information and belief, Roach misrepresented the date of the Satisfaction of Judgment so that it appeared to the Court that it was filed prior to, rather than after, Ms. Kanmaz filed her Second OSC and served it on Roach.

109.    Upon information and belief, Roach made this misrepresentation under the belief that a Satisfaction of Judgment would be granted more of a preclusive effect and prevent a decision on the Second OSC on its merits if it was filed prior to, rather than after, the Second OSC.

110.    Roach insinuates that Ms. Kanmaz's unemployment funds were fraudulently obtained or

otherwise illicit based on "payments from several other sources in addition to her employer of record, BuyBuy Baby Inc." **Exhibit U**, ¶ 12. It is unclear what "several other sources" Roach is referring to, but the payments from BuyBuy Baby Inc. are for her two days a week employment there, which is not mutually exclusive with receiving unemployment insurance, and the payments from Door Dash which are similarly part time also do not prohibit the receipt of unemployment. A beneficiary of unemployment insurance may work part-time without losing their unemployment benefits. Regardless, if Roach doubted whether the funds restrained on July 10, 2020 were exempt, then there should have been a hearing on Ms. Kanmaz's OSC to determine the source rather than simply ruling that the Judgment was satisfied.

111.    Lastly Roach asserts that "At no point does Defendant dispute that she owes the debt." **Exhibit U**, ¶ 16.

112.    But in her OSC, Ms. Kanmaz asserts that "I have no knowledge of this case against me" and that she wants the "chance to defend [her]self." **Exhibit Q**.

113.    On August 17, 2020, the Court entered an order on the OSC granting it only "to the extent that the default judgment dated June 18, 2008 in favor of Citibank in the amount of $3,255.71 be and the same is SATISFIED." **Exhibit V** (Order on Second OSC).

114.    Satisfactions of Judgment are filed to notify the Court that a judgment debtor has paid a valid judgment against them. Roach's use of the Satisfaction to retain exempt unemployment funds garnished with a judgment procured by a false affidavit of service twists this purpose to subvert the laws protecting due process and exempt income.

115.    On August 24, 2020, Ms. Kanmaz timely filed a *pro se* notice of appeal to preserve her rights to challenge the ruling. The claims brought by way of this suit do not depend on the result

of the appeal.

**Defendants inflicted substantial "garden variety" emotional distress damages on Ms. Kanmaz**

116.    Ms. Kanmaz was so shocked when she learned her bank account had been frozen that she began to sweat all over.

117.    At first, because both her and her husband's accounts were frozen, she thought the freeze must have resulted from something he had done. They had a big fight about it – she blamed him for this incredibly stressful and unexpected financial loss during the already stressful COVID-19 pandemic.

118.    After they spoke with Roach and learned that the putative judgment was against her, the anger became guilt for Ms. Kanmaz and her husband became furious. They considered separating over the fighting. Ms. Kanmaz's husband was so upset at her, and she felt so guilty, because she had blamed him for the illegal restraints when they were not his fault.

119.    Ms. Kanmaz still feels guilty about blaming her husband and they still have fights about it.

120.    The whole experience made her constantly feel tired. Her anxiety was especially bad when she was waiting for Roach to respond to her and later for the Court to make decisions.

121.    When she received the exemption claim forms (more than two weeks after they were dated) and learned that her funds had been exempt (and thus that their garnishment was illegal), she felt stupid and helpless, that if she spoke English better or understood more about U.S. law that she would not have been tricked.

122.    She could not sleep from crying and constantly thinking about it. She would wake up in

the middle of the night so that she would only be able to get 2-3 hours of sleep a night. Her mind was full of it 24 hours a day.

123.    She was afraid she was going to get in a car accident because she was so distracted by the stress and tired.

124.    If Ms. Kanmaz knew that she owed the money she would not mind, but Defendants suddenly taking her money over a debt she could not remember and without a chance to defend herself felt very unfair. She felt completely disrespected, that they were treating her more like they were robbers than attorneys.

125.    She gained ten pounds from stress eating. Ice cream was one of the only things that helped comfort her.

126.    It took so much effort and time for Ms. Kanmaz to prepare her Second OSC (**Exhibit Q**): going to the Turkish consulate, sending overnight mail to her brother in Turkey and him sending back documents from Turkey, finding her old driver's license, writing everything out in a second language, and going to court. To see all that effort and time be so easily subverted by Roach deceptively filing a Satisfaction of Judgment made her feel completely overwhelmed and defeated.

127.    All of those trips made her anxious about exposing both herself and her husband to COVID-19, since her husband would often accompany her to help translate. Ms. Kanmaz took COVID-19 tests in April and July, and always would wear gloves and masks and carry hand sanitizer when she went somewhere, but none of these precautions could alleviate her anxiety about her or her husband getting COVID-19 from these trips, especially because of her husband's pre-existing condition that made him vulnerable to COVID-19.

128.    In addition to anxiety about her and her husband's health, Ms. Kanmaz had started working at Doordash, a "gig economy" delivery service, which does not allow drivers to work when they have COVID-19, so she was also scared of losing income if she contracted the disease while making these trips to get the judgment vacated.

### COUNT # 1 (AGAINST ALL DEFENDANTS): VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT

129.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

130.    The purpose of the FDCPA is "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses."  15 U.S.C. § 1692(e); see also *Hamilton v. United Healthcare of La., Inc.*, 310 F.3d 385, 392 (5th Cir. 2002) ("Congress, through the FDCPA, has legislatively expressed a strong public policy disfavoring dishonest, abusive, and unfair consumer debt collection practices, and clearly intended the FDCPA to have a broad remedial scope.").

131.    Congress designed the FDCPA to be enforced primarily through private parties – such as plaintiff – acting as "private attorneys general."  *See* S. Rep. No. 382, 95th Con., 1st Sess. 5, ("[t]he committee views this legislation as primarily self-enforcing; consumers who have been subject to debt collection abuses will be enforcing compliance"); and *Jacobson v. Healthcare Fin. Servs.,* 516 F.3d 85, 91 (2d Cir. 2008) ("[i]n this way, the FDCPA enlists the efforts of sophisticated consumers like [plaintiff] as 'private attorneys general' to aid their less sophisticated counterparts, who are unlikely themselves to bring suit under the Act, but who are assumed by the Act to benefit from the deterrent effect of civil  actions brought by others.").

132.    The obligation alleged to be owed by Plaintiff is a "debt" as defined by 15 U.S.C. § 1692a(5) because the putative credit card debt was incurred primarily for family, personal or household purposes.

133.    Plaintiff is a "consumer" as defined by 15 U.S.C. § 1692a(3) because Plaintiff was alleged to owe a "debt" as defined by 15 U.S.C. § 1692a(5).

134.    For the reasons set forth in the "Parties" section of this complaint each Defendant is a "debt collector" as defined in 15 U.S.C. § 1692a(6).

135.    Defendants violated the following sections of the FDCPA: 15 U.S.C. §§ 1692e, 1692f, and 1692g. By way of example and not limitation, Defendants violated the FDCPA by taking the following actions in an attempt to collect a debt or in connection with an attempt to collect a debt: using false, deceptive or misleading representations or means; misrepresenting the character, amount, or legal status of the debt; misrepresenting the compensation which may be lawfully received; misrepresenting  or falsely implying  that an individual is an attorney or that any communication is from an attorney; representing or implying that nonpayment of any debt will result in the seizure, garnishment, attachment, or sale of any property or wages of any person unless such action is lawful and the debt collector or creditor intends to take such action; threatening to take and actually taking an action prohibited by law, or threatening to take an act not intended to be taken; ; using unfair or unconscionable means; collecting or seeking to collect any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law; threatening to take any nonjudicial action to effect dispossession or disablement of property if there is no present right to possession of the property claimed as collateral through an enforceable security interest or the property is exempt by law from such dispossession or

disablement; failing to provide information as required by 1692g(a); and filing to comply with their requirements under 1692g(b).

**COUNT #2 (AGAINST ALL DEFENDANTS):**
**VIOLATIONS OF N.Y. GENERAL BUSINESS LAW § 349**

136.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

137.    New York General Business Law § 349(a) prohibits "deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in this state." An individual "injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such action." N.Y. Gen. Bus. § 349(h).

138.    As enumerated above, Defendants violated N.Y. Gen. Bus. § 349 *et seq.* by using deceptive acts and practices in the conduct of their businesses. These acts were done by Defendants systematically and, as such, have had a broad impact on consumers at large.

139.    Defendants committed the above described acts willfully and/or knowingly.

140.    In addition, as enumerated above, Defendants Aries and Gemini are also vicariously liable for violations of GBL § 349 by Defendant Roach.

141.    Defendants' wrongful and deceptive acts have caused injury and damages to Plaintiff and unless enjoined will cause further irreparable injury.

142.    As a direct and proximate result of those violations of N.Y. Gen. Bus. § 349 *et seq,* Plaintiff has suffered compensable harm and is entitled to preliminary and permanent injunctive relief, and to recover actual, treble, exemplary, and damages, together with costs and attorney's fees.

**COUNT #3: CONVERSION (AGAINST ALL DEFENDANTS)**

143.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

144.    Defendants are jointly and severally liable for conversion. Gemini, as the party in the collection lawsuit, acted through its agent, Roach, in converting Ms. Kanmaz's money.  Roach was acting within the course and scope of the authority given to them by Gemini.  For purposes of the conversion claim, the acts of Roach are the actions of Aries and Gemini.

145.    The elements of conversion in New York State include: 1) having a possessory interest in property; and 2) having the possessory interest taken or interfered with by another in a manner that is contrary to the possessor's rights.

146.    Property subject to conversion includes readily identifiable funds from a bank account.

147.    Defendants intentionally and without authority, assumed and exercised control over Ms. Kanmaz's funds, interfering with his right to possession of the same, by restraining his account; and the exempt funds therein.

148.    Defendants' improper restraint of Ms. Kanmaz's money, which harmfully interfered with Ms. Kanmaz's rights to control his own property, constitutes conversion.

149.    For the reasons stated in the statement of facts, and under Counts 1 and 2, Defendants' conduct is gross, wanton or deliberate and demonstrates a high degree of moral culpability. The conduct demonstrates malice, insult, and/or willful or reckless disregard of Ms. Kanmaz's rights, or other aggravated acts. Defendants' conduct evidences a high degree of moral culpability, or is so flagrant as to transcend mere carelessness, or constitutes willful or wanton negligence or recklessness to justify a punitive damage award.

150.    For these reasons, Plaintiff is entitled to punitive damages, in addition to actual damages. Actual damages include, *inter alia*, the loss of use of money for the period Defendants

wrongfully exercised dominion and control over Plaintiff's funds, and consequential damages resulting therefrom. Plaintiff suffered serious mental distress and disruption of his daily life.

151.    The Gemini is directly liable as the judgment creditor and is vicariously liable for the acts of Roach.

### COUNT #4: VIOLATIONS OF EIPA (AGAINST ROACH)

152.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

153.    New York Judiciary Law § 487 creates a private right of action against an attorney or counselor who "[i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party;" or "willfully receives any money or allowance for or on account of any money which he has not laid out, or becomes answerable for."

154.    As enumerated in the Statement of Facts, Roach violated Judiciary Law § 487 in connection with the Order to Show Cause.

155.    Plaintiff is entitled to actual damages, treble damages, and attorneys' fees and costs for the violations of N.Y. Judiciary Law § 487, and Plaintiff so seeks.

### COUNT #5: VIOLATIONS OF EIPA (AGAINST GEMINI)

156.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

157.    Under N.Y. Civil Practice Law and Rules § 5222-a(c)(4), when an executed exemption claim form sent to a judgment creditor is accompanied by information demonstrating that all the funds in the account are exempt, the judgment creditor is required to, within seven days, instruct the bank to release the account and deem the restraint void.

158.    Failure to comply with this provision deems the judgment creditor to be in bad faith and

subject to EIPA's penalties for such bad faith.

159.    Under CVP § 5222-a(g), the judgment debtor shall be awarded costs, reasonable attorney fees, actual damages and statutory damages of $1,000 for these violations.

160.    Defendant Gemini failed to, either directly or through its attorney Roach, instruct Ms. Kanmaz's bank to release the account upon receiving the OSC from Ms. Kanmaz with the attached notice of unemployment benefits and other documents evincing that the funds garnished were exempt unemployment.

161.    Thus under EIPA Gemini's conduct should be deemed in bad faith and it should be found to have violated EIPA.

## JURY DEMAND.

162.    Plaintiff demands a trial by jury.

## PRAYER

163.    WHEREFORE, Plaintiff requests the following relief:

   a.    A declaration that Defendants have committed the violations of law alleged in the action;

   b.    An order enjoining and directing Defendants to cease the misconduct that is the basis of this Complaint;

   c.    Actual damages;

   d.    Statutory damages under 15 U.S.C. § 1692k, GBL § 349, and EIPA;

   e.    Exemplary and punitive damages under GBL § 349 and for conversion;

   f.    Treble damages pursuant to Judiciary Law § 487;

   g.    Attorney's fees and costs under 15 U.S.C. § 1692k, GBL § 349, and EIPA;

   h.    A judgment for actual, statutory, punitive, and exemplary damages;

   i.    Prejudgment and post judgment interest as allowed by law;

   j.    All other relief, in law and in equity, both special and general, to which Plaintiff may be justly entitled.

Dated:  Brooklyn, New York
        May 20, 2021

                                Respectfully submitted,
                                /s/
                                Ahmad Keshavarz

The Law Office of Ahmad Keshavarz
277 Washington Ave., # 6K.
Brooklyn, NY 11205
Phone: (347) 308-4859
Fax:    (877) 496-7809
Email: ahmad@NewYorkConsumerAttorney.com